BRONDERSLEV MOTOR SALES COMPANY, APPELLEE, v. NEBRASKA BUICK AUTO COMPANY, APPELLANT.

FILED OCTOBER 20, 1923. No. 22514.

Corporations: PROCESS: "MANAGING AGENT." Under the contract, the material points of which are set forth in the opinion, and the evidence, it is *held* that the persons served with summons as "managing agents" of defendant were not such, and that by such service the court did not acquire jurisdiction of the person of defendant.

APPEAL from the district court for Kearney county: WILLIAM A. DILWORTH, JUDGE. *Reversed and dismissed.*

Reavis & Beghtol and J. L. McPheely, for appellant.

M. D. King and B. H. Bracken, contra.

Bronderslev Motor Sales Co. v. Nebraska Buick Auto Co.

Heard before MORRISSEY, C. J., DEAN, LETTON and GOOD, JJ., REDICK and SHEPHERD, District Judges.

REDICK, District Judge.

This action is based upon a written contract between the plaintiff and defendant, to recover damages or commissions claimed to be due plaintiff under said contract. The contract is quite lengthy and need not be quoted in full, but the following excerpts are the material portions thereof necessary for an understanding and decision of the questions presented:

"The seller agrees to sell the dealer Buick automobiles, hereinafter described by model number, terms sight draft with bill of lading attached (payable with collection charges) f. o. b. Flint, Michigan, at a discount of 10 per cent. from list prices hereinafter mentioned (at which price all such Buick automobiles shipped under this agreement will be billed). In addition to the purchase prices mentioned below, the dealer agrees also to pay the seller the amount of any taxes which the seller is or may be required to pay upon the automobiles, parts, accessories, tires or other goods sold hereunder, by any present or future, municipal, state, or federal law or taxing authority whether retroactive or otherwise.

"The seller reserves the right to change any of the above prices upon notice in writing duly mailed to the dealer, and also to make changes in design or add any equipment to, or make improvements on Buick automobiles at any time without incurring any obligations to install same on automobiles previously purchased.

"The seller further agrees to sell the dealer Buick repair parts of their manufacture as may be made for such automobiles and bill same, net cash, payable the tenth of the month following the date of billing, at a discount of fifteen per cent. from list prices established from time to time by the seller and which are subject to change without notice, and provided the dealer carries in stock at all times during the life of this agreement Buick repair parts

to the amount of $3,000 or more an additional 10 per cent. discount will be allowed, provided the dealer makes a deposit with the seller at the time of signing this agreement of $100. However, in case the dealer does not make said deposit or at any time fails to make prompt remittance to the seller, as provided in the foregoing, said parts discount will be 10 per cent. from said list prices, and parts will be shipped C. O. D.

"Provided this contract is not canceled for any cause and the dealer does not violate any of the provisions of this contract, the seller on July 31, 1921, or as soon thereafter as. possible, will credit the account or pay said dealer an additional discount based on the net prices of the respective automobiles as follows:

"The dealer agrees First:    That he will thoroughly canvass and devote his best energies to promote the sale of Buick automobiles purchased under this agreement to persons residing within, and will not sell such automobiles to persons residing outside of the following district. (In case any of the automobiles sold or delivered by the dealer are used in another territory within four months from date of original sale or delivery, and remain in another dealer's territory for a period of five months or more, the dealer making the original sale or delivery will pay the dealer within whose territory the car is being used, an amount equal to 10 per cent. of the list price of the automobile in question as compensation for rendering customary gratis service due the purchaser.)

"(Then are stated the boundaries of the district.)

"Second:    To approve the appointment by the seller of such dealers for such subdistricts as in the opinion of the seller are necessary to thoroughly canvass and promote the sale of the seller's product in the foregoing territory."

"Fifth:    That the dealer is not authorized or empowered to act as agent for the Buick Motor Company or for the seller; nor to transact business, incur obligations or bill goods in its name, or for its account; nor on its behalf to make any promise, warranty or representation with re-

spect to goods or any other matter; and that the seller shall not be bound by the acts or conduct of the dealer."

"Eleventh: That the Buick Motor Company is the owner of the word 'Buick,' as applied to automobiles, and of the good-will attached thereto, and further that, if the word 'Buick' is used in the name under which the dealer's business is conducted, or in any sign or advertising displayed by him, he will, upon termination of this contract, or upon the request of the seller, or of the Buick Motor Company; discontinue the use of the word 'Buick' in such name, sign, or advertising, and thereafter he will not use either directly or indirectly in connection with any automobile business the word 'Buick' or any other name, title or expression so nearly resembling the same as to be likely to lead to confusion or uncertainty or to deceive the public.

"Twelfth: The seller will, at its option, furnish the dealer with an authorized 'Buick Service' sign, which the dealer will display in such manner and place as may be satisfactory to the seller. The dealer agrees properly to care for such sign, to furnish electrical connections and equipment therefor, and to keep the same lighted at proper times at the dealer's expense. Said sign shall be and remain the property of the seller and may be removed at its option at the termination of this contract or at any time prior thereto.

"Thirteenth: That the dealer will furnish the seller, with the signing of this agreement, a list of the names of Buick owners and prospects to whom the seller may mail each month a copy of the Buick Bulletin, the number of names on such list to be determined by the seller, and further that the dealer will pay to the seller each month the amount of postage required on such Bulletins. The dealer further agrees that the seller may cancel any portion or all of the list at any time, even before the termination or cancelation of this agreement."

"Sixteenth: The dealer agrees to sell back to the seller, at the latter's option, on the expiration, termination or cancelation of this contract any new Buick automobiles or parts therefor which the dealer may then have on hand, at

the same net price which the dealer paid to the seller therefor."

The above excerpts are taken from a contract with the "Car Sales Co.," but are substantially the same as the contract with plaintiff, and are so selected because one of the questions presented depends upon the proper construction of that contract. The defendant's principal place of business is in Lancaster county, but the suit was brought in Kearney county, the summons having been served upon "Fay Rogers and Soren Peterson as its managing agents." The persons served were partners doing business as Car Sales Company. Defendant filed a special appearance objecting to the jurisdiction of the Kearney county district court over the person of the defendant, upon the ground that the persons served were not its managing agents, and that defendant maintained and had no agent or office in Kearney county, and that, therefore, no summons had been served upon the defendant as required by law. The objection was supported by affidavits and oral testimony taken thereon and submitted to the court, which overruled the objections. A bill of exceptions upon the special appearance was preserved and is filed with the record in the case. Thereupon defendant filed a demurrer, which was overruled, and subsequently an amended answer, in both of which pleadings defendant pleaded to the jurisdiction and reserved its exception to the ruling of the court overruling its special appearance. The answer was to the merits and need not be referred to more particularly at this time. The case was presented to a jury and resulted in a verdict for the plaintiff for $1,398; motion for new trial having been overruled, defendant appeals.

The first question presented for our decision is presented by the first assignment of error: The court erred in overruling defendant's special appearance. As the alleged defect in the service is not apparent upon the face of the record, and the defendant having preserved his objection to the jurisdiction both by demurrer and the amended answer, the question of waiver is not pertinent, in fact the

point is not made by appellee. The question then is whether or not, under the evidence presented, the persons served were the managing agents of the defendant; if so, the ruling of the district court was correct, otherwise the court acquired no jurisdiction over the person of the defendant. Section 7634, Rev. St. 1913, provides that a summons against a corporation may be served upon its "managing agent," which term has been defined by this court several times:

"An agent of a foreign corporation, whose contract of agency demands of him the exercise of judgment in the business matters of his principal, and who has charge of the business of his principal in the territory covered by his contract, is a managing agent within the meaning of * * * the Code providing for the service of summons upon the managing agent of foreign corporations." *Ord Hardware Co. v. Case Threshing Machine Co.*, 77 Neb. 847.

"A 'managing agent' must be some person vested by the corporation with general powers involving the exercise of judgment and discretion, as distinguished from an ordinary agent or attorney, who acts in an inferior capacity and under the direction and control of superior authority, both in regard to the extent of his duty and the manner of executing it." Taken from 5 Words & Phrases, 4320. Quoted in *Ritchie v. Illinois C. R. Co.*, 87 Neb. 631.

The precise question here presented has not been passed upon by this court, and its proper solution depends upon the construction and meaning of the above contract. Appellee cites *Chicago, B. & Q. R. Co. v. Manning*, 23 Neb. 522, but in that case the service was upon a confessed managing agent, and the only question decided was whether service upon the managing agent in Douglas county, Nebraska, was permissible, his residence being in Iowa. Also *Fremont Butter & Egg Co. v. Snyder*, 39 Neb. 632, but in that case defendant had a branch house in the county of service, and maintained a sign thereon "Fremont Butter & Egg Co., Buyers of Butter and Eggs," and the person served had charge of its business, making contracts on behalf of defendant

for the purchase of butter and eggs; the work involved the fixing of the price and determination of the quality of the butter and eggs, and involved the judgment and discretion of the agent exercised for and on behalf of the defendant. Also *Ord Hardware Co. v. Case Threshing Machine Co., supra,* where the machine company entered into a contract with Cornell Bros., upon whom service was had as managing agents, whereby they were appointed agents for the sale of its machine and repairs in the city of Ord; the machines were to be sent to the agents, stored and cared for, and insured as the property of·defendant; the agents were required to satisfy themselves that all notes were signed by responsible men of known credit and reputation for paying debts; and it was held that they were managing agents within the definition of those terms quoted above. Also *Brown v. Chicago, M. & St. P. R. Co.,* 12 N. Dak. 61, in which it was held that "a station agent for a railroad company, authorized to sell and collect for passenger tickets, and to receive and deliver freight and collect for freight shipments, is sufficient of a managing agent" to authorize service of summons upon them.

It will be noted in all these cases the person served was beyond question the agent of the defendant, actually engaged upon the defendant's business, and the only question determined was whether or not he was a managing agent within the meaning of the statute providing for service of summons upon corporations.

Defendant also cites *Pugh v. Bothne Co.,* 178 Ia. 601, and insists that it is decisive of the question here. In that case plaintiff sued Bothne Company and Great Western Automobile Company, a nonresident corporation, for breach of warranty in the sale of an automobile, and procured the summons to be served upon A. T. Bothne as the agent of the automobile company, and the question was squarely presented upon a plea to the jurisdiction, which was sustained and case dismissed as to the automobile company, which ruling was reversed by the supreme court, which held that

the service was sufficient under section 3532 of the Iowa Code, which reads as follows:

"When a corporation, company or individual has, for the transaction of any business, an office or agency in any county other than that in which the principal resides, service may be made on any agent or clerk employed in such office or agency, in all actions growing out of or connected with the business of that office or agency."

The contract between Bothne Company and the automobile company in that case is quite lengthy and is similar in many respects to the contract under construction. By it the automobile company was termed the manufacturer and Bothne the dealer; an exclusive right to sell defendant's automobiles was granted the dealer in certain territory, the dealer agreeing not to solicit orders outside thereof; the dealer was to purchase catalogue equipment furnished by manufacturer; and the contract contained a large number of provisions not material to our present inquiry; and contained the following:

"(3)   As a part of the consideration for the granting of the exclusive right of sale aforesaid, the dealer agrees to push the sale of Great Western automobiles to the best of his ability within the territory aforesaid, employing a sufficient number of salesmen to cover the territory thoroughly.

"(4)   For the proper handling of the Great Western line the dealer agrees to provide in the city of Des Moines a building suitably located and arranged for the conduct of business, containing a sales room or repository of sufficient size to display the complete line. The dealer also agrees to maintain in addition a well-equipped repair shop, with a competent mechanic in charge at all times, so that purchasers of Great Western cars can have same repaired and adjusted promptly and at reasonable rates.

"(5)   The dealer agrees to make no contracts for the sale of Great Western automobiles with other parties acting for such dealer in said territory, without filing promptly with the manufacturer copies of all contracts so made,

so that it may have a complete record and a full knowledge of the conditions and volume of the business in every locality."

"(15) It is understood and agreed that this contract shall not in any respect make the dealer agent for the manufacturer to transact any business in its name or for it in any form, it being intended and expressly agreed that this contract is simply to give the dealer exclusive right to sell Great Western automobiles in the territory hereinbefore specified.

"(16) The dealer agrees to keep in stock, at all times during the term of this agreement, at least one automobile produced by the manufacturer, for the sole purpose of demonstrating and exhibiting to intended purchasers, and will maintain same in good order and repair."

The court held that the dealer under this contract was an agent of the defendant within the meaning of the section of the Code above quoted, concluding as follows:

"Construing this contract in the light of ordinary practical sense, Bothne was the 'dealer' of the Great Western Automobile Company, and was its sole representative in the specified territory to all retail purchasing customers. We think, therefore, that he and his place of business constituted an agency of the principal defendant, within the meaning of our statute above quoted." The court's conclusion was based upon the consideration that—

"Although the dealer agreed to purchase, he did so for the purpose of a resale. He was not a purchasing customer in the ordinary sense. The ultimate customer for the vehicle was to be found by the dealer. The dealer was not even purchasing at wholesale in the ordinary sense. He was not in the market buying automobiles in quantities where he could buy the best. The foregoing contract contains 21 specifications. Comparatively few of them deal with the relation of purchaser and seller. If no other relation than that of purchaser and seller was contemplated, then many of the provisions of the contract are not only unnecessary, but are impertinent. The dealer binds

himself therein to certain conduct in the handling of the product of the manufacturer even after its purchase. He undertook to furnish a place for the exhibition of the product of the manufacturer. He receives its literature and distributes its advertising. He delivers its printed warranties to his retail customers. He is entitled to the benefit of the advertising of the manufacturer, and the manufacturer is entitled to the benefit of his diligence in pushing sales to the end that the business of the manufacturer as well as that of the dealer may be increased."

We think that this case might be clearly distinguished from the case at bar by a comparison of the provisions of the two statutes, the Iowa statute providing for service upon any agent of the defendant, while the Nebraska statute provides for service only upon a managing agent, the distinction between whom was well pointed out in *Ritchie v. Illinois C. R. Co., supra.* In *Atlas Glass Co. v. Ball Bros.,* 87 Fed. 418, the court said with reference to a statute of similar import:

"In construing the statute the doctrine of *noscitur a sociis* is applicable; the term 'managing agent' is found associated with 'president,' 'secretary,' 'clerk,' 'cashier,' 'treasurer,' and 'director,' and it is to be presumed that the lawmakers intended to describe an agent possessing powers analogous to those of the executive officers of the corporation. He must be an agent employed by the corporation, representing it in some capacity and acting for it to a limited extent at least."

But the above quoted provisions of the Bothne contract, and upon which the court in great part rests its conclusion, are not to be found in the contract of defendant, unless, perhaps, in two particulars: Number "three" is similar to "first" in defendant's contract, but it will be noted in number "three" the obligation of the dealer is to promote the sale of Western automobiles generally within his territory, while in defendant's contract his obligation is only "to promote the sale of Buick automobiles purchased under this agreement." The distinction is important, the

greater obligation in the Bothne contract having evidently been inserted for the special benefit of defendant's business. And number "fifteen" is similar to "fifth" in defendant's contract, but the court disregards this provision, which may be permissible, though in our judgment it has a tendency to clarify the intentions of the parties. From the above considerations, without discussing the correctness of the ruling in the *Pugh* case, we do not think it decisive in this.

It is argued, however, by appellee, that the provision for the approval by the dealer of appointments of dealers in sub-districts, and the permission to use the word "Buick" in connection with the dealer's business, and the furnishing by the seller of an authorized sign, "Buick Service," which the dealer agrees to display in a manner satisfactory to the seller, and that the dealer shall furnish a list of names to whom the company should mail its magazine, the Buick Bulletin, and the agreement that the dealer will sell back to the company any new Buick automobiles or parts on hand at the termination of the contract, give support to the claim that the dealer was an agent in control of the business of the defendant. But we think no such inference properly arises, and these and kindred provisions are appropriate as a part consideration of the contract granting to the dealer exclusive right to sell automobiles in the territory stated; they grant no authority to the seller to bind the defendant by any contract, nor do they leave to the dealer any judgment or discretion to be exercised by him with relation to the business of the defendant. True, they are provisions which were expected to redound to the benefit of both parties, but the idea of the employment of the dealer as agent in connection with those matters cannot be found to arise from the words used or the nature of the transaction. The provision for payment of 10 per cent. of list price on cars sold by the dealer and used in territory other than his own, and reciprocal provisions in contracts of other dealers for the benefit of the plaintiff in *his* territory, afford no inference of agency,

though in the correspondence between the parties such payments were styled "commissions," for the reason that sales referred to were not to be made for or by defendant, but by dealers. As to whether or not defendant assumed any responsibility as to these transactions we express no opinion, as it is not material to our present inquiry. We have examined this contract with great care and are unable to wrest from its language or the transactions to which it relates any authority conferred upon the dealer to bind the defendant to any contract in any way, much less have we been able to discover that the dealer has been clothed with any such authority as is requisite to constitute a managing agent.

We are clearly of the opinion that the district court erred in overruling the special appearance of the defendant, and that the court was without jurisdiction. In view of this conclusion it is not necessary, nor would it be proper, to discuss questions connected with the merits of the defendant's case.

REVERSED AND DISMISSED.